HENDERSON *v.* YOUNG.

No. 9911.   SEPTEMBER 21, 1934.

*J. A. McFarland, Y. A. Henderson,* and *J. M. Lang,* for plaintiff in error.

*J. H. Paschall* and *R. Carter Pittman,* contra.

BECK, P. J.   S. G. Young filed his application for permission to file an information in the nature of quo warranto, alleging substantially as follows:   He is a citizen and taxpayer of Gordon County, and was duly elected tax-commissioner on April 20, 1933, when an election was held to fill a vacancy in said office.   In said election relator received a majority of the votes cast, which fact was duly certified according to law. Notwithstanding this, T. L. Hender-

son, one of relator's opponents who was defeated in the election, was given a commission by the Governor. Under this commission Henderson took possession of the office, took the oath thereof, and is now exercising the privileges and receiving the emoluments thereof without lawful authority, and in disregard of relator's rights, and is usurping the office. Relator alleges that he claims title to the office and the right to exercise all the privileges and receive all the emoluments thereof. He attaches to his petition as an exhibit a copy of an alleged consolidated return, which shows that he received one more vote than Henderson, signed by the election superintendents and managers who held the election. "Relator shows that the said consolidated return, a copy of which is hereto attached, and which shows on its face that relator was elected to the office of tax-commissioner, was transmitted to the Secretary of State in accordance with law. and was by him transmitted to the Governor of said State in accordance with the law; but notwithstanding this the said Governor illegally and wrongfully issued a commission to respondent."

The defendant demurred on the grounds, among others, that the petition failed to set forth a cause of action; that it did not show title to the office in Young; that it set forth mere conclusions of the pleader; that it failed to allege that Young was eligible for the office, and failed to show any authority in the Governor to issue a commission to him.

The court overruled the demurrer, and the respondent excepted. He filed his answer and denied the substantial allegations of the petition. He admitted that he had been commissioned by the Governor to fill the office, that he had given bond and taken the oath of office, and that he had performed the duties and functions of the office and was receiving the emoluments thereof. He averred that the alleged consolidated returns declared on by Young were spurious and not genuine, and were the act and deed of some unauthorized person or persons; that the people whose names appear thereon did not sign it, and there had never been a legal consolidation of the votes of Gordon County on April 21, but on that date only three out of fourteen precincts of the county were represented, and no legal quorum of the election managers was present; that the names appearing on the alleged returns were placed there by W. R. Rankin, who was not a manager, and who had no authority to have

anything whatever to do with the election; that said returns were not mailed to the Secretary of State by any one authorized to do so, but by W. R. Rankin; that the superintendents and managers of the election on April 20, 1933, did meet in the court-house on May 2, and did legally consolidate the votes of the county and declare the result thereof; that there were present, on May 2, two managers from the county-site precinct and at least one manager from every country precinct and voting place in the county; that there was a legal quorum present; that the act on said date by said managers and a quorum thereof was legal and binding; that on said date the first and only legal consolidation of the votes from the returns of the election on April 20 was made, and T. L. Henderson was declared elected to the office; that it was declared by said consolidated returns that Henderson received 327 votes, and that Young received 323 votes; that the election managers themselves, after declaring the result, signed their own names to the certificate showing the result, and caused the consolidated returns, together with the list of voters, the tally-sheets, and other things required by law, to be mailed to the Secretary of State. A motion to strike many paragraphs of the response was sustained, and the respondent excepted.

■ The ruling in the first headnote needs no elaboration.

■ The court did not err in overruling the general demurrer to the petition. The information in the nature of quo warranto was a proper proceeding to decide the question of the right to the office as between Henderson and Young. In *Hathcock* v. *McGouirk*, 119 *Ga.* 973 (47 S. E. 563), it was said: "An application for leave to file a quo warranto, reciting that at an election for sheriff of a named county, held on a given day, the applicant received a majority of the votes cast, which fact was duly certified by the proper authorities; that, notwithstanding, his opponent was given a commission by the Governor of the State, under which he took possession of the office and was exercising the privileges and receiving the emoluments thereof, without lawful authority and in utter disregard of the rights of the applicant; and that the term of office for which applicant was elected has not expired, etc., is not demurrable on the ground that the application does not set forth a cause of action, or on the ground that the superior court of that county is without jurisdiction to entertain the same, or on the

ground that the applicant's remedy was to have contested the election, and the commission issued by the Governor to the respondent is conclusive as to his right to hold the office. The motion to dismiss the proceeding and the motion to vacate the order directing the writ to issue embraced substantially the same matters set up by way of demurrer, and were properly overruled by the court." In *Milton* v. *Mitchell,* 139 *Ga.* 614 (77 S. E. 821), it was held: "Where an information in the nature of a quo warranto is brought by an individual to establish his right to an office as against an alleged usurper, it is not essential, in order to obtain leave to file the information, that a rule nisi shall be first granted calling upon the respondent to show cause why the information should not be filed against him. . . Where in such a case there is a petition praying leave to file an 'accompanying information in the nature of a quo warranto,' calling upon the respondent named therein to show cause why he should not be ousted from office for the reason stated in the petition and the 'accompanying information,' and the facts set forth in the information are positively verified, the judge may, without issuing a rule nisi, grant leave to file the information, and at the same time pass an order calling upon the respondent to show cause at a given time why he should not be ousted from the office claimed by the relator. . . As the petition and accompanying information constituted one proceeding, it was not subject to special demurrer on any of the following grounds, viz.: it did not show upon what facts the relator claimed the office; nor did it allege that the respondent was exercising the duties of the office; nor did it set forth when the term of office claimed by the relator began or ended."

Other decisions to the same effect might be cited; and in view of those decisions and other reasons for the ruling, we are of the opinion that there is no merit in the general demurrer. The case was fully set out and the essential facts alleged, and the court did not err in overruling the special grounds of demurrer.

■ It is not necessary to take up all the grounds of Henderson's response, or to rule upon each one of them; but certain of them were meritorious and should not have been stricken. We refer to those grounds as meritorious which show that the first purported consolidation of the return made by the superintendents of the election on April 21 was not in conformity to the statute and was

not a legal consolidation of the votes in the precincts of the county. "The superintendents, to consolidate the vote of the county, must consist of all those who officiated at the county-site, or a majority of them, and at least one from each precinct. They shall make and subscribe two certificates, stating the whole number of votes each person received in the county; one of them, together with one list of voters and one tally-sheet from each place of holding the election, shall be sealed up and, without delay, mailed to the Governor; the other, with like accompaniments, shall be directed to the clerk of the superior court of the county, and by him deposited in his office. Each of said returns must contain copies of the original oaths taken by the superintendents at the court-house and precincts." Political Code, § 82, par. 9. From the consolidated return made under this statute on April 21, 1933, it appears that Young received 328 votes and Henderson received 327 votes. But on May 2, 1933, the superintendents of the election met, as prescribed in the Code section referred to, consolidated the votes, and made and subscribed two certificates, stating the whole number of votes each person received in the county; and under this consolidation Henderson appears to have had a plurality of two votes. It is contended by the relator that the second meeting of the superintendents of the election and their consolidation of the vote were illegal, and that when they made their first consolidation and return and subscribed the certificates and performed the other acts required by the statute they had no right to meet again or to make another return. In support of this contention *Davis* v. *Warde*, 155 *Ga.* 748, 776 (118 S. E. 378), is cited. In that case it was said: "In 20 C. J. 204, § 263, it is said that 'When a board of canvassers has fully performed its duty, proclaimed the result of the count according to law, and adjourned sine die, it is functus officio; the persons who compose it have no power voluntarily to reassemble and recanvass the returns. Neither have their successors in office power to recanvass returns already canvassed by the old board. Where a canvass has been concluded under the statutory provisions for its conduct existing at the time, the legislature has no power to create a new tribunal with power to recanvass the election and to award possession of the office to another claimant. However, the fact that a board of canvassers convasses part of the returns, declares the result, and adjourns sine die, does not deprive

it of authority or relieve it of the duty to reassemble and canvass all the returns. After county canvassers have forwarded an abstract of votes for certain offices to the Secretary of State to be canvassed by the State canvassing board, a change made subsequently by them in such abstract is a nullity, but there is nothing improper in their action in subsequently completing their duties by forwarding the abstracts of votes for other offices.' And in section 265 of the same volume it is said that 'After a board of canvassers has completed the count and awarded a certificate of election, another certificate of election awarded to an opposing candidate, based upon a voluntary recanvass by the board, is a nullity.' And see sections 200, 254, and 258. The latter section reads in part as follows: 'It is settled beyond controversy that canvassers can not go behind the returns. The returns provided for by law are the sole and exclusive evidence from which a canvassing board, or official, can ascertain and declare the result. The canvassers are not authorized to examine or consider papers or documents which are transmitted to them with the returns, or as returns, but which under the statutes do not constitute part of the returns. Neither are they at liberty to receive and consider extrinsic evidence, unless the official returns are destroyed before they are canvassed, in which case secondary evidence of their contents may be received.' . . In Mechem on Public Officers, § 211, it is said that 'Board can act but once. But having once met and fully completed their duty, their powers are exhausted, and they can not again meet and recanvass the votes or reverse their prior decision and announce a different result.' And this rule seems to be the logical result of our elective system. If canvassing boards can meet and change the results which they have once declared, they can also meet and change the results any number of times. Serious and injurious results might follow if such powers were held to exist in canvassing boards. When they have met and canvassed the returns of an election and declared the result, they have exhausted their powers, and have no authority to meet and recanvass the result of an election and to declare a different result. In the instant case it appears that the second action of the mayor and council was founded, not on the returns of the managers of the election, or on the certificate of election, but upon the extrinsic and ex parte evidence of outsiders; and we are of the opinion that the resolution adopted by the mayor and council

on December 12, 1922, declaring the result of the election, was prima facie correct and could not be changed by the subsequent action of the canvassing board."

We do not question the soundness of this decision; but if the allegations contained in the response in regard to this matter are true, then the first purported canvass of the returns was no consolidation at all. It was not done by a majority. According to the response, the duty prescribed by the Code section, supra, was not fulfilled, and the purported consolidation amounted to nothing. There was evidence to show that a majority of the superintendents of the election did not meet on April 21 and comply with the requirements of the section just referred to. Evidence was offered to establish the fact that there was no compliance with that section by the superintendents of the election on April 21. Judge Rankin was introduced by Young, and on cross-examination he testified: "But there were at the time of the election, on the 20th day of April, fourteen different polling-places." Again, he testified: "I signed thereto [the election certificate in controversy] the signatures of J. E. Hardy, W. H. Jones, I. F. Taylor, W. H. Chitwood, M. M. Scott, and R. C. Fuller. . . C. J. Hopper, I believe I signed his name. He wasn't there." The superintendents signing the consolidated returns on the 21st of April were J. H. Gordon, T. J. Champion, J. E. Hardy, W. A. Jones, B. F. Whittemore, C. J. Hopper, I. F. Taylor, W. H. Chitwood, Kay Nelson, J. W. C. Roberts, C. D. Shaw, G. D. Bandy, M. M. Scott, R. S. Reeves, F. H. Fuller, and J. H. Bramlett. Rankin further admitted, on cross-examination, that he did not see Bandy, Roberts, or Nelson do anything towards consolidating this vote. Nelson testified that he did not participate in the consolidation, but did sign a blank piece of paper which was later filled out. Bramlett testified: "I did not in any manner participate in the canvassing or consolidating them, counting the result." Bandy testified: "I did not examine any of the precinct returns, or have anything to do with canvassing or counting the result, or assent to that." Roberts testified: "I did not inspect or examine or canvass, or count any other precinct at all. I did not see them. I had nothing to do with the consolidating or adding or canvassing of any votes, except my own. I say I did sign my name to a blank piece of paper." There was other evidence tending to show that the

majority of the superintendents did not sign the consolidated returns. Under this evidence the court should not have directed the verdict, but under proper instructions should have submitted to the jury the question whether or not there was a compliance with the statute, supra, and whether what purported to be a consolidated return on April 21 was such a compliance with that statute as to make it a valid return; so that when made the superintendents were finally discharged from their duties as such, they could not meet again.          *Judgment reversed. All the Justices concur.*